IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 25-cr-00032-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

LUIS ENRIQUE PEREZ,

       Defendant.

---

## MOTION TO DISMISS THE INDICTMENT
## UNDER THE SECOND AMENDMENT (PRESERVATION ONLY)

---

LUIS PEREZ moves to dismiss the indictment because 18 U.S.C. § 922(g)(1) is unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), both facially and as applied to persons with felony histories like his. Mr. Perez recognizes that these claims are currently foreclosed in the Tenth Circuit under *Vincent v. Bondi*, --- F.4th ---, 2025 WL 453999 (10th Cir. 2025), and raises them for preservation purposes only.

### PROCEDURAL HISTORY

On January 28, 2025, the government filed an Indictment charging Mr. Perez with a single count of Possession of a Firearm/Ammunition by a Prohibited Person, in violation of Title 18, United States Code, Section 922(g)(1). Doc. No. 1. The charge stems from an incident on September 5, 2024, when the police allegedly found two firearms in Mr. Perez's home while conducting a parolee search.

## LEGAL BACKGROUND

According to the Supreme Court, the Second Amendment codified a preexisting individual right, *District of Columbia v. Heller*, 554 U.S. 570 (2008), that cannot be treated as a "second-class right" compared to other Bill of Rights provisions, *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). In *Bruen* and *Rahimi*, the Court established and applied the test for evaluating laws, like Section 922(g)(1), that infringe on this fundamental right. Those cases instruct that all conduct covered by the Second Amendment's plain text is presumptively constitutional, and that the government must justify any laws that infringe on such conduct with a robust historical record.

## I.    *Bruen* established the test for adjudicating Second Amendment challenges.

### A.    The Supreme Court determined in *Heller* that the Second Amendment protects a preexisting individual right.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held that the Second Amendment codified a preexisting individual right to possess and use firearms for lawful purposes like self-defense. *See Heller*, 554 U.S. at 592, 624.

*Heller* did not establish a test for Second Amendment challenges to firearm regulations. *See Silvester v. Becerra*, 583 U.S. 1139 (2018) (Thomas, J., dissenting from denial of certiorari). Instead, the Court set a floor—"whatever else" the Amendment "leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. And although it noted that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," the Court emphasized that it did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626.

Following *Heller*, federal courts of appeals generally developed a means-end balancing test for adjudicating Second Amendment challenges. *See Bruen*, 597 U.S. at 17-19. In addition, the Tenth Circuit rejected a constitutional challenge to Section 922(g)(1) by giving controlling weight to dictum in *Heller* regarding the supposedly "longstanding prohibitions on the possession of firearms by felons." *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (quoting *Heller*, 554 U.S. at 626).

### B.    *Bruen* and *Rahimi* set forth a test rooted solely in the Second Amendment's text and history.

In *Bruen*, the Supreme Court disavowed applying means-end scrutiny and adopted a text-and-history standard in its place. *See* 597 U.S. at 19. *Bruen* explains that (1) conduct covered by the Second Amendment's plain text is presumptively protected and cannot be restricted, *id.* at 24, unless (2) the government can demonstrate a historical tradition of "relevantly similar" regulations from the founding era, *id.* at 24, 29. To do so, the government must prove that the challenged law is sufficiently similar to historical laws with respect to "both why and how it burdens the Second Amendment right." *Rahimi*, 602 U.S. at 698.

### 1.    Conduct covered by the Second Amendment's plain text is presumptively constitutional.

Under the Supreme Court's text-and-history test, the threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does, then "the Constitution presumptively protects that conduct." *Id.*

This inquiry is a straightforward one. Because the Amendment's plain text covers "the right of the people to keep and bear Arms," U.S. Const. amend. II, "when the Government regulates arms-bearing conduct . . . it bears the burden to justify its regulation," *Rahimi*, 602 U.S. at 691 (quotation omitted). For example, in *Bruen*, the Court analyzed whether the Amendment's text covered the petitioners' ability to publicly carry handguns. *See* 597 U.S. at 11-16, 32-33. The Court

3

summarily recognized that the petitioners (who the parties agreed were "law-abiding") were part of "the people," and the firearms in question (handguns) fell within "Arms." *Id.* at 31-32. Indeed, the Court had already indicated in *Heller* that the Second Amendment's plain text at least covers the right of "law-abiding, responsible citizens" to possess "handguns held and used for self-defense in the home." 554 U.S. at 635-36.

The new textual question in *Bruen* was whether the phrase "to keep and bear Arms" also covers public carry, not simply possession at home. 597 U.S. at 32-33. The Court had "little difficulty concluding that it does" because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32.

The Court also easily resolved this threshold inquiry in *Rahimi*, where it considered a facial challenge to Section 922(g)(8), which prohibits individuals from possessing firearms while subject to certain domestic violence restraining orders. 602 U.S. at 684-86. "[N]o one question[ed]" that the statute "addresses individual conduct covered by the text of the Second Amendment," *id.* at 708 (Gorsuch, J., concurring), as the statute obviously regulates arms-bearing conduct. And the Court flatly rejected the government's argument—grounded in *Heller*'s reference to "law-abiding, responsible citizens"—that Mr. Rahimi was not protected by the Second Amendment simply because he was not "responsible." *Id.* at 701-02.

> **2.    The government must show that any law infringing on presumptively constitutional conduct is consistent with the nation's "historical tradition of firearm regulation."**

If a law infringes on presumptively constitutional conduct under the Second Amendment's plain text, courts must "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Bruen*, 597 U.S. at 27. If "no such tradition" exists, then the challenged statute is unconstitutional. *Id.*

*Bruen* and *Rahimi* place the burden on the government to prove that regulations infringing on presumptively constitutional conduct "are consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24, 33-34. That burden is heavy and requires robust evidence of such a tradition. *See id.* at 20, 58 n.25, 64-66, 70.

*Bruen* and *Rahimi* also set forth certain guideposts for courts to follow when evaluating such historical evidence.

**First,** the cases provide temporal guidance as to when the historical tradition must have been established. Specifically, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 34. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 27.

**Second,** *Bruen* and *Rahimi* underscore that challenged regulations must be "relevantly similar" to historical regulations with respect to both "how and why" the regulations "burden" the Second Amendment right. *Id.* at 29; *see Rahimi*, 602 U.S. at 692. That means the government must show how the challenged law is sufficiently similar to founding-era tradition with respect to both its purpose and the degree to which it infringes on the Second Amendment right—taking into consideration metrics like procedural protections, duration of infringement, and severity of penalty. *Rahimi*, 602 U.S. at 698-99. "Even when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* at 692.

In *Bruen*, the Court rejected numerous historical laws as insufficiently similar to the public carry law at issue, often because the historical laws were narrower in scope and carried significantly lower penalties than the modern law. Those rejected historical laws included:

- Various founding-era laws that criminalized bearing arms "in a way that spreads 'fear' or 'terror' among the people," 597 U.S. at 50, because they only prohibited certain manners of public carry, and were thus narrower in scope, *see id.* at 46-51;

- A number of mid-19th century state laws that proscribed concealed carry of pistols and other small weapons, again because they did not prohibit all public carry, and were narrower in scope, *see id.* at 52-55;

- A number of mid-19th century surety statutes with comparatively better procedural protections (requiring a showing that an individual posed a particular threat), smaller burdens (imposing "a fee rather than a ban"), and less punitive force (designed to incentivize "responsible arms carrying" rather than impose "any degree of punishment"), *see id.* at 55-59; and

- Increased gun regulation in the "Western territories" in the late-19th-century, including regulations seemingly banning all manner of public carry, in part because they were too "localized" and "irrelevant" to most of the American population, and in part because some "were held unconstitutional shortly after passage," *id.* at 66-69.

In contrast, the Court in *Rahimi* determined that some of those same historical laws were relevantly similar to Section 922(g)(8), because *that* statute—at least as it was applied to Mr. Rahimi—has a similarly narrow scope (regulating only individuals "found by a court to pose a credible threat to the physical safety of another") and a short-term impact (only "temporarily" disarming such individuals). 602 U.S. at 702.

Finally, *Bruen* highlights two rules of adjudication. First, insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." 597 U.S. at 44 n.11; *see id.* at 39. Second, courts are "entitled to decide a case based on the historical record compiled by the parties," consistent with "the principle of party presentation." *Id.* at 25 n.6; *see id.* at 60.

## ARGUMENT

### I.    *Heller* does not foreclose Mr. Perez's constitutional challenges.

As a threshold matter, *Heller* did not foreclose Mr. Perez's facial and as-applied challenges to Section 922(g)(1), although Mr. Perez recognizes that the Tenth Circuit has held otherwise

following both *Bruen* and *Rahimi*, and that his claims are currently foreclosed in this circuit. *See Vincent*, --- F.4th ---, 2025 WL 453999 (discussing *McCane*, 573 F.3d 1037).

*McCane* was decided shortly after *Heller*, before the Supreme Court established the parameters of the test for Second Amendment challenges in *Bruen* and *Rahimi*. In *McCane*, the Tenth Circuit relied exclusively on the dictum in *Heller* that nothing in the case "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 573 F.3d at 1047 (quoting *Heller*, 554 U.S. at 626). *But see id.* at 1048-49 (Tymkovich, J., concurring) (characterizing that dictum as "the opinion's deus ex machina dicta" because it "may lack the 'longstanding' historical basis that *Heller* ascribes to it"). But the *Heller* Court expressly caveated that it was not conducting a historical analysis of any such prohibitions, and it did not establish the test required to adjudicate Second Amendment challenges. *See* 554 U.S. at 626; *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (noting that the *Heller* Court "explicitly deferred analysis" of the felon possession issue).

Indeed, the Supreme Court has made abundantly clear that the legal tests it imposes are binding and trump adherence to its dicta. In *Seminole Tribe of Florida v. Florida*, the Court stated that both the "result" of its opinions and "those portions of the opinion necessary to that result" are binding, even on itself. 517 U.S. 44, 67 (1996). In contrast, the Court has repeatedly stressed that its dicta, even when repeated, does not resolve issues it has not yet addressed. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 646 (2022) (finding entirely unpersuasive prior "tangential dicta" addressing an issue that, until that case, "did not previously matter all that much and did not warrant [the] Court's review"); *Heller*, 554 U.S. at 625 n.25 (finding "inconceivable" the idea that the Court "would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon . . . footnoted dictum in a case where the point was not at issue and was not

argued"). Thus, while the Supreme Court's dicta has significant weight on lower courts, the upshot of its cases is evident: If faced with a choice between relying exclusively on Supreme Court dicta or applying its binding legal test, courts must employ the latter.

*Rahimi*—and the Supreme Court's actions post-*Rahimi*—only confirm this conclusion. The *Rahimi* majority reiterated that, so far, the Court has not "undertake[n] an exhaustive historical analysis . . . of the full scope of the Second Amendment." 602 U.S. at 702. Likewise, Justice Gorsuch underscored in his concurrence that the Court has not yet "resolve[d] whether the government may disarm an individual permanently," nor has it "approve[d] in advance" laws "denying firearms on a categorical basis." *Id.* at 713 (Gorsuch, J., concurring).

Moreover, *Rahimi* makes particularly clear that as-applied challenges are available to 18 U.S.C. § 922(g), as there is no reason to have as-applied challenges in one subsection of that statute but not others. There, the Court held only that Section 922(g)(8) "is constitutional as applied to Rahimi." 602 U.S. at 701. Thus, even assuming, *arguendo*, that *Heller*'s felon-in-possession dictum has some controlling force post-*Bruen* and *Rahimi*, *see Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), at minimum that dictum cannot be read to foreclose as-applied challenges to Section 922(g)(1) under the Second Amendment.

In sum, because the Supreme Court has established a new and binding legal test, *Heller* does not foreclose Mr. Perez's challenges under the Second Amendment.

## II. Section 922(g)(1) is unconstitutional under the Second Amendment.

Under the framework announced in *Bruen*, Section 922(g)(1) violates Mr. Perez's Second Amendment right to keep and bear arms. Because the Amendment's "plain text" does not differentiate between persons with a felony history and other members of "the people," a total prohibition on firearm possession by felons presumptively violates the Second Amendment. The government cannot rebut that presumption because there is no longstanding historical tradition of

"relevantly similar" felon dispossession laws, let alone felon dispossession laws that applied to persons with felony histories like Mr. Perez's.

### A.    The Second Amendment's plain text covers firearm possession by felons.

The Second Amendment's plain text clearly covers possession of firearms and ammunition, the conduct proscribed by Section 922(g)(1), including the handgun and ammunition in this case.[1] *See Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); *id.* at 629 (noting that "handguns are the most popular weapon chosen by Americans for self-defense in the home"); *see also Caetano v. Massachusetts*, 577 U.S. 411, 416–17 (2016) (Alito, J., concurring) (recognizing that "semiautomatic pistols" are among the "weapons most commonly used today for self-defense").

Likewise, Mr. Perez is part of "the people" within the meaning of the Second Amendment. *See Rocky Mountain Gun Owners*, 121 F.4th at 116. Just as the Amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32, it also does not draw a felon/non-felon distinction.

*Heller* plainly supports this conclusion. Construing the words "the people" in that case, the Court said, "the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"belongs to all

---

[1] The Tenth Circuit's decision in *Rocky Mountain Gun Owners v. Polis* does not bear on this conclusion. There, the Court considered whether a law prohibiting persons under 21 from *purchasing* firearms fell within the plain meaning of "keep and bear Arms," and determined it did not. 121 F.4th 96, 120 (10th Cir. 2024). But the Court expressly circumscribed its ruling to "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 120 n.6. There can be no dispute that simple possession of a firearm and/or ammunition—the conduct proscribed by § 922(g)(1)—falls within the plain meaning of "keep and bear Arms." *See id.* at 134 (McHugh, J., concurring).

Americans." *Id.* at 580-81; *Bruen*, 597 U.S. at 70. Interpreting "the people" to exclude felons would conflict with that principle. And while *Heller* did refer specifically to the Second Amendment rights of "law-abiding, responsible" individuals, the Supreme Court has flatly rejected the premise that such language limited the scope of the Second Amendment. *Rahimi*, 602 U.S. at 701.

**B.    The government cannot show that Section 922(g)(1) is part of the nation's historical tradition of firearm regulation.**

Because "the Second Amendment's plain text covers [Mr. Perez's alleged] conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. To rebut the presumption, the government must establish that Section 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Id.* As a result, Section 922(g)(1) is unconstitutional unless the government can show a robust tradition of relevantly similar historical regulations with respect to both their purpose and the manner in which they burden the Second Amendment right.

**1.    Section 922(g)(1) is facially unconstitutional.**

The government cannot meet its burden with respect to any applications of Section 922(g)(1), for at least two independent reasons.

**First,** there is no historical analogue for Section 922(g)(1), let alone a sufficiently robust tradition of such analogues. Although the government need not point to a "historical twin," *Rahimi*, 602 U.S. at 701, the Supreme Court nonetheless requires an especially close fit between modern and historical regulations, *compare Bruen*, 597 U.S. at 55-59 (surety statutes insufficiently similar to broad prohibition on public carry), *with Rahimi*, 602 U.S. at 698-99 (surety statutes sufficiently similar to temporary restriction on firearm possession by individuals subject to certain restraining orders). That means the government cannot meet its burden simply by showing that firearm possession and/or firearm use was sometimes regulated in discrete contexts in the founding era, or

by showing that persons who committed crimes were subjected to unrelated punishments. Rather, the government needs to show that the founding generation tried to prevent persons convicted of felonies or felony-equivalent crimes from simple possession of firearms for *any* purpose, and that it did so in a manner sufficiently comparable to Section 922(g)(1).

The government cannot do that because there is no tradition of felon dispossession statutes—at either the federal or state level—predating the 20th century. Section 922(g)(1) itself only traces its origins back to 1938, when Congress passed the Federal Firearms Act that prohibited only certain felons with "a few violent offenses" from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The statute was not amended to prohibit the "possession by all felons" until the 1960s. *Id.* And scholars have not identified founding-era colonial or state felon dispossession statutes either. *See, e.g.*, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142-43 & n.11 (2007). The "Founders themselves could have adopted" laws like Section 922(g)(1) to "confront" the "perceived societal problem" posed by felons. *Bruen*, 597 U.S. at 27. But they did not, and that inaction means Section 922(g)(1) is unconstitutional on its face.

**Second,** the statute is independently facially unconstitutional because of the extraordinary burden it puts on the Second Amendment right of every person that it impacts. Section 922(g)(1) indefinitely—and for all practical purposes, permanently—bans all firearm possession, so long as the firearm traveled in interstate commerce at some point. The government will not be able to identify any historical tradition of relevantly similar firearm regulations that so completely infringed upon an individual's ability to exercise such a fundamental right. *See Rahimi*, 602 U.S. at 699-702.

### 2.    Section 922(g)(1) is unconstitutional as applied to Mr. Perez.

Even if the government could meet its burden with respect to some applications of Section 922(g)(1) (which it cannot), it cannot demonstrate a relevantly similar historical tradition with respect to persons in Mr. Perez's situation, for several reasons.

**First,** as previously discussed, the government cannot meet its burden of proving that *any* felon dispossession laws were part of this nation's historical tradition of firearm regulation at the time of the founding—let alone felon dispossession laws that imposed a permanent, lifetime ban on all firearm possession. Likewise, the government will not be able to demonstrate a relevantly similar historical tradition of firearm dispossession with respect to the circumstances of Mr. Perez's case. *See, e.g.*, *Range v. Att'y Gen.*, ---F.4th---, 2024 WL 5199447, at *5-8 (3d Cir. 2024) (en banc) (holding that the government failed to carry its burden to show that applying Section 922(g)(1) to the defendant would be "consistent with the Nation's historical tradition of firearm regulation").

**Second,** Section 922(g) is unconstitutional as applied to Mr. Perez because it lacks adequate procedural protections. *See Rahimi*, 602 U.S. at 696–99 (existence of procedural protections before deprivation of Second Amendment right is relevant consideration when evaluating potential historical analogues). Unlike certain historical firearms regulations (and even Section 922(g)(8) in at least some of its applications), Section 922(g)(1) does *not* require a court to make any specific finding that a defendant presently poses a "demonstrated threat[] of physical violence." *See id.* at 698.

**CONCLUSION**

For the foregoing reasons, Mr. Perez requests that this Court dismiss the indictment.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Jennifer Beck
JENNIFER BECK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Jennifer_Beck@fd.org
Attorney for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2025, I filed the foregoing **MOTION TO DISMISS THE INDICTMENT UNDER THE SECOND AMENDMENT (PRESERVATION ONLY)** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Thomas Minser, Assistant United States Attorney
Email: thomas.minser@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Luis Perez (via U.S. mail)

s/ Jennifer Beck
JENNIFER BECK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Jennifer_Beck@fd.org
Attorney for Defendant